IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAVID N. CONKLIN,**

    **Plaintiff,**

    v.

    Civil Action 2:12-cv-1172
    Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## OPINION AND ORDER

Plaintiff, David N. Conklin, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income.  This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 14), and the administrative record (ECF No. 8).  For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

    **I.**    **BACKGROUND**

Plaintiff filed his applications for benefits on May 11, 2009, alleging that he has been disabled since September 15, 2008, at age 26.  (R. at 147-53, 154-56.)  Plaintiff alleges disability as a result of Factor V Leiden (blood-clotting disorder), epilepsy, hypertension, anxiety and depression.  (R. at 189, 219.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before Administrative Law Judge Ken B. Terry ("ALJ").  The ALJ held a video hearing on July 28, 2011, at which Plaintiff, represented

by counsel, appeared and testified. (R. at 42-67.) Lynne M. Kaufman, a vocational expert, also appeared and testified at the hearing. (R. at 67-74.) On August 22, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 20-29.) On October 23, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-5.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the July 28, 2011 hearing, Plaintiff testified that that his blood circulation issues would make it difficult for him to work. He noted that, because of his circulation issues, he cannot sit or stand for very long. (R. at 44.) He testified that he is constantly worried about getting a blood clot and becomes extremely anxious about his health problems. (*Id*.) He stated that he has trouble breathing and reported that he is often weak. When asked about his significant weight loss, Plaintiff responded that he stopped eating due to depression. (R. at 54.) Plaintiff reported that he still has anxiety attacks and manic episodes despite his medication regimen. (R. at 62.)

Plaintiff testified that he cannot perform daily activities independently. He had a home health aide for over a year, but did not at the time of the hearing. He testified that his family physician "took [the home health aide] away" in order to help him "try to get better." (R. at 45.) He testified that he now does his own laundry, "a few pieces at a time." (R. at 48.) He stated that his father grocery shops for him and his neighbors "help keep [him] stocked in food because [he] can't get out." (R. at 50.) He testified that he has difficulty with daily activities because of anxiety, noting he thinks of ten different things at once and that his "mind just gets crazy." (R.

2

at 49.) Plaintiff testified that he tried to attend college in 2008, but was hospitalized twice during that time due to his blood-clotting issues. (R. at 53.)

**B.     Vocational Expert Testimony**

Lynne M. Kaufman, testified as the vocational expert ("VE") at the administrative hearing. (R. at 67-74.) The VE testified to Plaintiff's past relevant employment as an accounts receivable/fraud investigator, at the skilled, sedentary exertional level; assistant fast food manager, which he performed at the heavy exertional level; telephone solicitor, at the semi-skilled, sedentary exertional level; and customer service representative, at the skilled, sedentary exertional level. (R. at 67-68).

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC")[1] to the VE. The ALJ asked the VE to assume an individual with Plaintiff's age, education, and work experience who was capable of a range of medium work with ability to lift and/or carry 50 pounds occasionally, 25 pounds frequently; sit for four hours at a time and a total of eight hours per day; stand and/or walk a total of two hours at a time but a total of eight hours per day; precluded from climbing ropes, ladders, and scaffolds but able to occasionally climb stairs and ramp and frequently balance, stoop, kneel, crouch, and crawl with no significant manipulative limitations; with no significant visual or communicative limitations; and would need to avoid moderate exposure to fumes and work hazards. Mentally, the hypothetical individual would be capable of simple to moderately complex tasks and could perform tasks in a routine work environment, but would not be able to work in an environment with a fast pace or strict production quotas. (R. at 71.) Based on this hypothetical, the VE acknowledged that

---

[1] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

3

Plaintiff could perform his past relevant work as cashier and in accounts receivable and customer service work, along with other medium and light strength jobs such as a packer, with 500 local jobs and 325,000 nationwide jobs; office helper, with 600 local jobs and 300,000 nationwide jobs; and sales attendant, with 500 local jobs and 300,000 nationwide jobs. (R. at 71-73.) The VE acknowledged that if Plaintiff was off task 20% of the day or missed 2 or more days of work per month, he would not be able to work competitively. (R. at 73-74.) Finally, the VE testified that she believed her testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"). (R. at 73.)

### III.   MEDICAL RECORDS[2]

Mr. Spindler, M.S., examined Plaintiff on behalf of the state agency on June 30, 2009, to assess his mental status. (R. at 637-43.) According to Mr. Spindler, Plaintiff presented as depressed. He was talkative and maintained eye contact and basic composure as he spoke. Plaintiff reported that he had no problems with his eating habits and generally slept through the night. He indicated that he occasionally takes naps during the day. Plaintiff estimated that he has attempted suicide on five or six occasions and said the last attempt was four or five months before, when he took an overdose of medication. When asked if he was currently experiencing suicidal thoughts, Plaintiff said that he was and explained that he was tired of dealing with his health problems and life in general. He noted that he feels guilty about his past drug involvement. He described his energy level as poor. (R. at 639.) Plaintiff also stated that he felt

---

[2] Plaintiff is not challenging the ALJ's findings with respect to his physical impairments. Instead, in his Statement of Errors, Plaintiff sets forth one exclusive challenge to the ALJ's decision. He contends that the ALJ did not take into account all of his limitations that result from his physical and mental impairments as found by the state-agency psychologists. The Court therefore focuses on the medical evidence that relates to Plaintiff's non-exertional limitations affecting his performance of activities and his mental impairments.

anxious and worried about his health and his future. (R. at 640.) Mr. Spindler found his judgment to be adequate for most routine matters. (*Id.*)

Mr. Spindler diagnosed Plaintiff with an anxiety disorder with depression and polysubstance dependence, with sustained full remission for 18 months. (R. at 642.) He was assigned a Clinical Global Assessment of Functioning ("GAF") score of 50.[3] (*Id.*) Mr. Spindler, however, found Plaintiff's functioning to be "fairly well intact." (R. at 641.) Mr. Spindler further noted that Plaintiff's functional GAF was likely higher because:

> [Plaintiff] lives with a friend of the family and [he] helps with such household chores as washing dishes, sweeping floors, and doing the laundry and helps with the cooking. He has one friend with whom he enjoys talking and visiting. He has some outside interests and shops for things he needs. Thus from a functional perspective the GAF score is thought to be 65.

(*Id.*) Mr. Spindler concluded that Plaintiff would be moderately impaired is his ability to withstand the stress and pressure associated with day-to-day activities due to his anxiety disorder and depression. (R. at 642.)

On July 27, 2009, after review of Plaintiff's medical record, Leslie Rudy, Ph.D., a state-agency psychologist, assessed his mental condition. (R. at 663-80.) In Section I of the Mental Residual Functional Capacity Assessment form ("Mental RFC Assessment form"), Dr. Rudy opined that Plaintiff was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. at 677.) In the narrative assessment in Section III of the Mental RFC Assessment form, Dr. Rudy concluded

---

[3] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 50 is indicative of "severe symptoms . . . or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ." *Id.* at 34.

that Plaintiff would ultimately be capable of performing simple to moderately complex tasks in a routine environment. (R. at 679.) On March 28, 2010, state-agency psychologist, Cynthia Waggoner, Psy.D., affirmed Dr. Rudy's assessment in its entirety. (R. at 886.)

Plaintiff was treated at Six County, Inc. from August 2010 through at least June 2011. (R. at 1163-75, 1244-54.) Initially, Plaintiff reported that due to his medical problems, he has had anxiety and depression. (R. at 1163.) He noted that he often cries, has no motivation, and has no energy. (R. at 1166.) Plaintiff further noted that he sleeps a lot, withdraws, and experiences feelings of worthlessness and isolation. He stated he is depressed nearly every day. (R. at 1166.) Plaintiff also reported symptoms of anxiety, noting that he has difficulty being in crowds of people, gets shaky, and worries about everything. (*Id.*) Plaintiff reported issued with substance use and addiction. (*Id.*) Plaintiff was diagnosed with bipolar disorder and borderline personality disorder and assigned a GAF score of 51.[4] (R. at 1168.) Plaintiff was scheduled for medication evaluation and management. (*Id.*) Plaintiff also received counseling from a social-worker who reported in February 2001 that Plaintiff was making "some progress" towards his goals, but his mood was depressed and anxious. (R. at 1175.)

On May 18, 2011, Patricia Gainor, M.D., completed a Bipolar Disorder medical statement after seeing Plaintiff on April 22, 2011. (R. at 1176-79.) Dr. Gainor opined that Plaintiff's bipolar disorder causes him marked restrictions of activities of daily living and extreme difficulty maintaining social functioning. (R. at 1177.) Dr. Gainor also opined that Plaintiff experiences deficiencies of concentration, persistence, and pace resulting in frequent failure to complete tasks in a timely manner and repeated episodes of decompensation. (*Id.*) Dr.

---

[4] Individuals with scores of 51-60 are classified as having "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

6

Gainor further opined that Plaintiff was extremely limited in his work abilities due to his psychiatric state. (R. at 1177-79.)

## IV. THE ADMINISTRATIVE DECISION

On August 22, 2011, the ALJ issued his decision. (R. at 20-29.) At step one of the sequential evaluation process,[5] the ALJ found that Plaintiff had not engaged in substantially gainful activity since September 15, 2008. (R. at 22.) The ALJ found that Plaintiff had the severe impairments of hypertension, myocardial infarction, a history of pulmonary embolism, coagulation disease, a history of transient ischemic attack, seizure disorder, a history of deep venous thrombosis, superficial venous thrombosis, depression, and anxiety. (*Id.*) He concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) At step four of the sequential process, the ALJ evaluated Plaintiff's RFC. The ALJ's RFC is as follows:

---

[5] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant can lift and/or carry and push and/or pull a maximum of 50 pounds occasionally and 25 pounds frequently; sit for four hours at a time and a total of eight hours in an eight-hour workday; and walk and/or stand up to two hours at a time and a total of six hours in an eight-hour workday. The claimant is precluded from climbing ladders, ropes, or scaffolds; more than occasional climbing of ramps or stairs; and more than frequent balancing, kneeling, stooping, crouching or crawling. The claimant is further limited to simple to moderately complex tasks in routine work environments but without fast-paced work or strict production quotas.

(R. at 24.) In reaching his determination as to the restrictions related to Plaintiff's mental impairments, the ALJ assigned "no weight" to the opinion of Dr. Gainor, finding Dr. Gainor's opinion to be a consultative examination. (R. at 27.) The AJL further noted that there are no treatment notes from Plaintiff's single visit with Dr. Gainor to identify Plaintiff's condition or limitations associated with his mental impairments. (*Id.*) The ALJ also found no evidence from Dr. Gainor or the record to substantiate her opinion regarding Plaintiff's restrictions. (*Id.*) The ALJ assigned "significant weight" to the psychological opinion of consultative examiner Mr. Spindler, finding his assessments generally consistent with the record. (*Id.*) The ALJ also afforded "significant weight" to the opinions of the state-agency psychologists, Drs. Rudy and Waggoner, noting their opinions were generally consistent with the record. (*Id.*) The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, he further found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above RFC. (R. at 25.)

Relying on the VE's testimony, the ALJ determined that Plaintiff was able to perform his past relevant work, along with jobs that exist in significant numbers in the state and national

economy. (R. at 27-29.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 29.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

9

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### VI. LEGAL ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ erred by affording significant weight to the opinions of Drs. Rudy and Waggoner but then ignoring, without explanation, parts of the state-agency psychologists' opinions that were unfavorable to his decision. (ECF No. 9.) Specifically, Plaintiff posits that the ALJ erred in failing to account for Dr. Rudy's check-box assessment that Plaintiff had moderate limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Pl.'s Statement of Errors 16, ECF No. 9.) This argument reveals Plaintiff's misunderstanding of the significance of those findings on the Mental RFC Assessment form.

The Social Security Administration's Programs Operations Manual System ("POMS") clarifies that the "Moderately Limited" box Dr. Rudy checked is simply part of a worksheet that "does not constitute the [doctor's actual] RFC assessment." POMS DI § 24510.060(B)(2), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (last visited Mar. 4, 2014); *see also Velez v. Comm'r of Soc. Sec.*, No. 1:09-CV-0715, 2010 WL 1487599, at *6 (N.D. Ohio Mar. 26, 2010) ("In general, the decisions have respected the Commissioner's argument the ALJ is not required to include the findings in Section I in formulating residual functional capacity"); *Liggett v. Astrue*, No. 08-1913, 2009 WL 189934, at *8 (E.D. Pa. Jan 27, 2009) ("Part I of the form completed by [the reviewing physician] is 'merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and does not constitute the RFC assessment.'") (citing POMS §§ DI 24510.060, .061, .063, and .064).

Checking the box "Moderately Limited" notes only that the claimant's capacity is impaired; it does not indicate the degree and extent of the limitation. *See id*. § 24510.063(B)(2). Rather, the medical consultant must record "the actual mental RFC assessment" in Section III. *Id*. at § 24510.060(B)(4).

In accordance with the foregoing directives, Dr. Rudy recorded Plaintiff's mental RFC assessment in Section III of the Mental RFC Assessment form, and provided a narrative discussion supporting the assessment. (R. at 679.) More specifically, Dr. Rudy opined in Section III that Plaintiff was "ca[pable] of simple to moderately complex tasks in a routine work environment." (*Id*.) Dr. Waggoner affirmed Dr. Rudy's Mental RFC Assessment form in its entirety. Having accorded their opinions "significant weight," the ALJ incorporated the narrative assessment in Section III into his RFC determination, concluding that Plaintiff was capable of "simple to moderately complex tasks in routine work environments."[6] (R. at 24.) Accordingly, the ALJ did not err when he failed to specifically account for the moderate limitation noted by the state-agency reviewing psychologists in Section I of the Mental RFC Assessment form and instead relied on the narrative portion of the Assessment when arriving at Plaintiff's RFC.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision. Accordingly, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner of Social Security's decision.

**IT IS SO ORDERED**

Date: March 6, 2014                      /s/ *Elizabeth A. Preston Deavers*
                                                             Elizabeth A. Preston Deavers
                                                             United States Magistrate Judge

---

[6] The ALJ included an additional limitation, noting that Plaintiff's work could not be "fast-paced" or include "strict production quotas." (R. at 24.) Thus, the ALJ's RFC was even more restrictive than Dr. Rudy's and Dr. Waggoner's assessments.

11